IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DAWN M. MASON,                          )     Case No. 5:23-cv-331
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )     MAGISTRATE JUDGE
                                        )     THOMAS M. PARKER
                                        )
COMMISSIONER OF                         )
SOCIAL SECURITY,                        )     **MEMORANDUM OPINION**
                                        )     **AND ORDER**
          Defendant.                    )

     Plaintiff, Dawn M. Mason, seeks judicial review of the final decision of the

Commissioner of Social Security, denying her application for disability insurance benefits

("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and

Fed. R. Civ. P. 73.  ECF Doc. 8.  Because the Administrative Law Judge ("ALJ") failed to apply

proper legal standards by failing to adequately articulate why she discounted the state agency

medical consultants and why several medical determinable impairments were not "severe

impairments," the Commissioner's final decision denying Mason's application for DIB must be

vacated and Mason's case must be remanded for further consideration.

## I.     Procedural History

     On September 10, 2020, Mason filed an application for DIB.  (Tr. 19, 59, 65, 205).

Mason alleged a disability onset date of March 15, 2020, (Tr. 19, 66, 69, 209, 239), and asserted

she was disabled due to a stroke, speech issues, diabetes, and a hole in her heart, (Tr. 59-61, 66,

233).  Her application was denied at the initial level, (Tr. 72-75), and then upon reconsideration, (Tr. 84-87).  She then requested a hearing.  (Tr. 88-89).  On November 9, 2021, a hearing was held before ALJ Paula Goodrich via telephone.  (Tr. 30-58).  On March 1 2022, the ALJ issued an unfavorable decision, finding that Mason had not been under a disability within the meaning of the Social Security Act from March 15, 2020 through the date of the decision.  (Tr. 16-24).  Mason requested review of the decision by the Appeals Council.  (Tr. 198-199).  On February 2, 2023, the Appeals Council denied further review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  On February 21, 2023, Mason filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.     Evidence

### A.      Personal, Educational, and Vocational Evidence

Mason was born on November 13, 1964 and was 55 years old on the alleged onset date (Tr. 60, 66, 202-203).  Mason completed her high school education. (Tr. 234).  In her application for DIB, Mason indicated that she had worked as a server at a restaurant from January 1980 to March 2020 and she stopped working on March 15, 2020 because the company she worked at closed.  (Tr. 233-234).

### B.      Relevant Medical Evidence

#### 1.      Pre-Onset Date Evidence

On December 18, 2017, Mason visited Selwyn-Lloyd McPherson, M.D., a neurologist, complaining of difficulty with speech and right-side heaviness as a result of a stroke she suffered in November of 2017.  (Tr. 407).  On examination, Dr. McPherson noted that: (i) cognitive function was normal except for slightly slurred speech; (ii) cerebellar function was normal; and (iii) several muscle and sensory tests were normal bilaterally.  (Tr. 408).  Dr. McPherson

2

diagnosed Mason with a cerebellar stroke and dysarthria (slurred speech), hemiparesis affecting her right side, and alteration of senses due to a cerebral infarction.  (Tr. 408).  In January 2017, Mason revisited Dr. McPherson, who confirmed his previous diagnosis and set forth a treatment plan that advised Mason to stop smoking, control her diabetes, and control her hypertension. (Tr. 411-412).

On January 9, 2020, Mason visited Clayton Seiple, D.O. because she was having trouble managing her type 2 diabetes mellitus and she indicated that her neurologist recommended she start disability.  (Tr. 332).  The general examination revealed nothing abnormal.  (Tr. 332-333). With regards to treating her diabetes, Dr. Seiple noted that Mason needed to adjust her dietary intake, she was not watching what she ate, and she was not checking her blood sugar enough. (Tr. 332).  On February 10, 2020, Mason had a follow-up appointment with Dr. Seiple concerning her diabetes where she turned in her diet log.  (Tr. 334).  Dr. Seiple noted that Mason's diet was poor, as it consisted of too many carbohydrates and sugary snacks, and he also noted that Mason's hypertension was stable and well controlled.  (Tr. 334).

### 2.  Post-Onset Date Evidence

On July 16, 2020, Mason saw Dr. Seiple, reporting that she bruised easily and asking whether she could stop taking aspirin.  (Tr. 337).  Mason's general examination was largely unremarkable with the neurological exam revealing: "mild dysarthria but easily understandable. CN II-XII otherwise intact.  moves all limbs spontaneously, no focal sensory deficits."  (Tr. 340). Dr. Seiple made the following assessments: diabetes, neutrophilic leukocytosis (elevated level of white blood cells), hyperlipidemia (elevated level of lipids in the blood), hypertension, and a cerebrovascular accident.  (Tr. 337).  Concerning Mason's diabetes, Dr. Seiple noted that: (i) he agreed with Mason's prior primary care physician that Mason was making poor food choices;

(ii) he would start Mason on metformin to help control her blood sugar; and (iii) Mason stated that she would be resistant to checking her blood sugar three times a day.  (Tr. 338).  Concerning her past stroke, Dr. Seiple's notes indicated an "[u]nclear etiology from [cerebrovascular accident] December 2018" and stated that Mason had residual slurred speech from the incident but was easily understood and sounded largely normal.  (Tr. 339).

On July 23, 2020, Mason saw Christopher Heller, D.O., because she had a reaction to her metformin medication which caused preorbital swelling of her right eye.  (Tr. 341).  Dr. Heller noted that it was unclear whether the medication caused the preorbital swelling but also noted that the swelling was improving.  (Tr. 341).  Dr. Heller stated that Mason's blood sugar was "ranging all over" and would be challenging to control.  (Tr. 341).

On October 15, 2020, Mason saw Jon Tosino, M.D., to request a flu shot and she complained of night sweats, intermittent daytime hot flashes, and easy bruising when she bumped into objects – which she attributed to medication she was taking.  (Tr. 360).  Dr. Tosino noted similar issues with Mason's blood sugar levels being unstable and encouraged her to improve her diet and decrease her carbohydrate intake.  (Tr. 360-362).

On January 14, 2021, Mason saw Dr. Seiple for a checkup and because of her fluctuating blood sugar levels.  (Tr. 373).  Mason complained of hot flashes and arthritic pain in her hands. (Tr. 374-375).  A review of her systems and her general examination were unremarkable. (Tr. 374-375).  Regarding her diabetes, Dr. Seiple noted Mason's blood sugar was still fairly erratic, likely due to her poor diet choices.  (Tr. 374).

On April 12, 2021, Mason had a follow-up appointment with Dr. Seiple.  (Tr. 400-402). A review of her systems demonstrated that: (i) Mason had occasional symptomatic low blood sugars; (ii) her hot flashes were under control; (iii) her general chronic hand pain had improved

4

with topical medication; and (iv) she had mild slurred speech.  (Tr. 401).  Her general examination was unremarkable save for symptoms of mildly slurred speech from her prior stroke.  (Tr. 402).  Dr. Seiple noted that Mason's blood sugar levels were concerning and further noted Mason was noncompliant with her treatment.  (Tr. 401).  Mason requested disability and Dr. Seiple noted that Mason: (i) denied having any new strokes; (ii) claimed she fell frequently; and (iii) stated that she was afraid of people making fun of her reduced ability to create fluid speech.  (Tr. 401).  Dr. Seiple suggested a follow up with a neurologist and stated that Mason had "[n]o obvious gross weakness, sensory deficit, or gait abnormality on exam that I see that would prevent her from working."  (Tr. 401).  Dr. Seiple further stated that Mason's speech was slightly slurred from a cerebrovascular accident, but she was easily understandable, and the slurred speech did not pose an impediment to work.  (Tr. 401).

On May 25, 2021, Mason saw Dr. McPherson for a neurological follow-up appointment in which he noted no change in Mason's neurological symptoms and continued the same recommended treatment for Mason to stop smoking, control her diabetes, control her hypertension, and use diet, exercise, and medication to lower her cholesterol.  (Tr. 442-447).  On August 3, 2023, Dr. McPherson performed a neurological examination that was unremarkable save for the continued findings that Mason had normal cognitive function except for slightly slurred speech and hypoesthesia (numbness).  (Tr. 452).  Dr. McPherson maintained the previous neurological diagnosis and recommended treatment.  (Tr. 452-453).

On June 10, 2021, Mason saw Mehr Kahn, M.D., on referral from Dr. Seiple concerning Mason's diabetes.  (Tr. 520).  Her review of systems was unremarkable.  (Tr. 509).  On general examination, Dr. Khan stated that Mason had: (i) no impaired proximal motor strength of upper and lower extremities; (ii) good eye contact, normal speech, orientation, and appropriate mood

and affect; and (iii) a normal diabetic foot exam.  (Tr. 508).  On June 28, 2021, Mason saw Dr. Khan for a follow-up appointment.  (Tr. 521).  Her review of symptoms was unremarkable, and her general examination revealed the same normal diabetic foot exam and the same neurological and psychological functioning.  (Tr. 504-505).

On July 8, 2021, Mason saw Dr. Seiple, complaining of sciatica pain and possible psoriasis on her head.  (Tr. 460).  Mason stated that she had had sciatica pain in her left leg for one to two months, the pain was persistent, the pain worsened when sitting for long periods of time and at night while lying down, and stretching and occasional Aspirin mildly improved the pain.  (Tr. 462).  For the sciatica, Dr. Seiple recommended over the counter ("OTC") pain medication and provided a list of exercises to help alleviate the pain.  (Tr. 460).

On September 3, 2021, Mason saw Dr. Khan for a follow-up appointment concerning her diabetes.  (Tr. 521).  Her review of symptoms was unremarkable, and her general examination revealed a normal diabetic foot exam, no impaired proximal motor strength of her upper or lower extremities, normal speech, and appropriate mood and affect.  (Tr. 504-505).

On September 9, 2021, Mason saw Dr. Seiple and noted that her sciatica had improved with the prescribed exercises and OTC medication, but daily numbness still persisted.  (Tr. 456).  Her review of systems and general examination were unremarkable save her complaint that she suffered from periodic dizziness.  (Tr. 456).  Mason stated that she had had three episodes of dizziness over the preceding two weeks, the dizziness felt like the room was spinning, the dizziness had no discernable triggers, and one episode had resulted in vomiting.  (Tr. 456).  Dr. Seiple recommended that Mason contact Dr. McPherson to schedule an appointment given that the dizziness was similar to the symptoms she had prior to her past stroke.  (Tr. 466).  As for her sciatic nerve pain, Dr. Seiple noted that Mason was to continue monitoring her pain levels and

using home exercise to help with the pain and he suggested that physical therapy might be needed if pain persisted or grew worse.  (Tr. 455).

On August 3, 2021, Mason saw Dr. McPherson for a neurological follow-up appointment.  (Tr. 469).  Dr. McPherson noted no new neurological symptoms, no motor or sensory deficits, and no visual symptoms.  (Tr. 469).  Her examination was unremarkable; she exhibited the same slurred speech and sensation limitations as before.  (Tr. 473).

On December 3, 2021, Mason saw Dr. Khan for a follow-up appointment concerning her diabetes.  (Tr. 524).  Her review of systems was unremarkable, and her general examination revealed the same neurological and psychological functioning as her previous examinations with Dr. Khan.  (Tr. 495-496).

At various times between September 2020 through October 2021, Mason reported being prescribed eight to eleven different mediations for her stroke (aspirin and clopidogrel), high blood pressure (losartan potassium and HCTZ), high cholesterol (simvastatin), diabetes (metformin, Tresiba, and insulin), vitamin D deficiency (vitamin D3), hot flashes (black cohosh), and arthritic pain (diclofenac sodium gel).  (Tr. 235, 266, 275, 296, 302, 313).

C.    **State Agency Reviewing Consultants**

At the initial level, on December 4, 2020, state agency consultant Mehr Siddiqui, M.D., reviewed the medical evidence and ultimately determined that Mason was not disabled.[1]  (Tr. 59-64).  Relevant to this case, Dr. Siddiqui found that Mason had two severe medically determinable impairments: (i) diabetes mellitus; and (ii) late effects of injuries to the nervous system.  (Tr. 61).  Moreover, Dr. Siddiqui found that Mason's individual statements concerning her symptoms was partially consistent with the total medical and non-medical evidence on file, stating:

---

[1] As part of that determination, Dr. Siddiqui found that Mason could perform work at a medium level of exertion and cited three occupations she could perform in the national economy.  (Tr. 63).

[Mason] reported having speech difficulties, shaking, and difficulty sustaining activities such as standing/walking.  She reported these become worse if she is flustered.  She reported to her doctor that she generally feels well, has good exercise tolerance, and is generally able to do her usual activities.  [Mason] does have h/o prior stroke, but physical exams do not note any significant speech limitations, shaking, or muscle weakness.

(Tr. 62).  On April 8, 2021, state agency consultant W. Scott Bolz, M.D., reconsidered the

medical evidence and affirmed Dr. Siddiqui's findings, including the finding that Mason had two

severe impairments.  (Tr. 65-70).

### D.    Relevant Testimonial Evidence[2]

Mason testified at the ALJ hearing.  (Tr. 37-53).  Mason testified that she drove daily and

when asked whether she helped watch her grandchildren, she responded that she would just visit

once or twice a month, or a week.  (Tr. 38).  Regarding her past employment, Mason testified she

had been serving tables for the past 25 years – setting up and breaking down, cashing people out,

and carrying full trays of food weighing up to 50 pounds – but she could no longer keep up with

the pace of the job.  (Tr. 39).  She testified that she went back to work several months after she

suffered her stroke in November 2017 and continued working until the restaurant closed due to

the COVID-19 pandemic.  (Tr. 40).  She testified that she had been working part-time, four to six

hours for five days a week, but needed to take a lot of breaks and reiterated that it was hard to

keep up after the stroke.  (Tr. 40-41).

When asked whether her condition had gotten worse since she stopped working, Mason

testified that she had sciatica issues that affected her while standing and sitting.  (Tr. 41).  In

addition to the stroke and the sciatic nerve issues, she testified that she had diabetes and

experienced issues controlling her blood sugar.  (Tr. 42-43).  She testified that she would

---

[2] Brett Salkin, a Vocational Expert ("VE"), testified at the ALJ hearing, (Tr. 53-57), but his testimony is not relevant for our review because the ALJ determined that Mason was not disabled at Step Two and made no findings concerning the VE's testimony, (Tr. 21-24).

experience low blood sugar levels while at work (either daily or every other day) and during an episode she would sweat, shake, have trouble holding objects, and she could not focus or concentrate. (Tr. 43-44). She testified that she would need a ten-minute break to get her blood sugar under control and if her blood sugar was high, it would cause her to run to the bathroom, feel sick, and get sleepy. (Tr. 44-45).

Mason testified that she could walk on a flat surface for 20 minutes straight before she would need to stop and sit down, either due to her blood sugar being low or pain from her sciatica. (Tr. 45). She also testified that she could maintain a sitting posture for up to half an hour before her legs would begin to bother her. (Tr. 47). When asked about how the stroke affected her speech, Mason stated that she had slurred speech that would get worse if she was flustered or stressed and she further testified she had trouble writing and reading orders. (Tr. 47-48). Mason testified that she could handle her own personal care and could complete household chores, including cooking dinner, doing laundry, and doing dishes. (Tr. 50). She further testified that she could take her grandchildren to the Akron Zoo weekly. (Tr. 51-52).

## III. The ALJ's Decision

On March 1, 2022, the ALJ issued an unfavorable decision, finding that Mason was not disabled under the Social Security Act based on Mason's May 5, 2021 application for DIB. (Tr. 19-24). The ALJ determined that Mason had the following medically determinable impairments ("MDI"): "post cerebrovascular accident in December of 2018 (prior to the alleged onset date), right-sided sciatica, diabetes mellitus, essential hypertension, vitamin D deficiency, nicotine dependence, mixed hyperlipidemia, caffeine dependence, and obstructive chronic bronchitis." (Tr. 21). However, the ALJ's analysis stopped at Step Two because she found that: "[Mason] does not have an impairment or combination of impairments that has significantly

9

limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, [Mason] does not have a severe impairment or combination of impairments (20 CFR 404.1521 *et seq.*).”  (Tr. 21-23).

In coming to her Step Two conclusion, the ALJ found that Mason’s MDIs could be reasonably expected to produce her alleged symptoms; however, she further determined that “[Mason’s] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent[.]”  (Tr. 22).  The ALJ addressed specific MDIs as follows:

> Regarding the claimant’s cerebrovascular accident, the undersigned notes that she worked after her stroke on a part-time basis (4 to 6 hours per day, 5 days per week) until her company closed down (hearing testimony). Moreover, the claimant’s physician, Dr. Seiple concluded in April of 2021 that she had no neurological deficits upon physical examination, including no obvious gross weakness, sensory deficits, or gait abnormality. Dr. Seiple also noted that the claimant’s speech was slight [*sic*] slurred, but this issue would not prevent her from working ([Tr. 401]). Additionally, a neurological examination performed in in August of 2021 revealed that the claimant was well nourished, well developed, in good health and spirits, and sensation to light touch and pinprick sensation was significant for hypoesthesia in a stocking glove distribution, but vibration and position sense were normal bilaterally, muscle strength was five out of five throughout, cranial nerves were intact, a Babinski’s sign was negative bilaterally, and deep tendon reflexes were normal and symmetric ([Tr. 473]). The claimant also reported engaging in daily activities such as driving, handling personal care, taking her grandchildren to the zoo weekly, and completing household chores such as cooking, laundry, and cleaning dishes (hearing testimony).
>
> Turning to the claimant’s remaining medically determinable impairments such as diabetes mellitus and hypertension, she had a limited and conservative treatment history for these conditions since the alleged onset date. In addition, the claimant had a prolonged history of medical non-compliance that worsened her symptoms, such as nicotine dependence (despite her providers advising her to quit smoking) ([Tr. 474]). The claimant’s providers also counseled her on compliance with lifestyle modification such as exercising, and compliance with taking her medications as prescribed ([Tr. 474]). Despite this medical non-compliance, diabetic-related physical examinations revealed findings such as a normal diabetic foot examination, normal motor strength and other neurological findings, and the claimant was alert and oriented to all spheres/in no acute distress ([Tr. 508]). Based on the above, the undersigned concludes that the claimant did not have a severe physical health impairment since the alleged onset date.

(Tr. 22-23).

Reviewing the opinion evidence on the record, the ALJ found that the state medical consultants' physical assessments were unpersuasive because the consultants were limited to information only available at the time they performed their evaluations, and "additional medical evidence received in the course of developing the claimant's case for review at the administrative hearing level justifies a conclusion that the claimant does not have a severe physical health impairment." (Tr. 23).

IV.    **Law & Analysis**

A.    **Standard of Review**

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"). But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own

11

regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)).

   **B.    Step Two – Non-Severe Impairment Findings**

   Mason asserts that the ALJ erred by failing to find that any of her nine MDIs were a severe impartment.  ECF Doc. 10 at 10-11.  She argues that the ALJ's decision was unreasonable and unsupported by substantial evidence because: (i) medical records clearly demonstrated that she suffered from functional limitations; (ii) Mason testified that her medical conditions caused substantial limitations; and (iii) the state agency consultants found that she had the severe impairments of diabetes and late effect of injuries to the nervous system.  *See id.* at 11-14.  She further argues that the ALJ failed to make a logical bridge between the evidence and her conclusion sufficient to permit meaningful judicial review.  *Id.* at 15.  Finally, she argues that the ALJ inappropriately relied on Mason's daily activities – "driving, personal care, cooking, laundry, cleaning dishes, and taking her grandchildren to the zoo once a week" – to discount the severity of her medical conditions.  *Id.* at 16-17.

   At Step Two, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe."  20 C.F.R. § 404.1520(a)(4).  If a claimant has an MDI, the ALJ must determine whether the impairment is severe.  20 C.F.R. § 416.920(c).  The claimant has the burden to show that she has *at least one* "severe impairment."  20 C.F.R. § 404.1520(a)(4)(ii), (c).  A "severe impairment" is a medical condition that has more than minimal effect on a claimant's mental or physical ability to do basic work

activities and is expected to last for 12 months or cause death.  20 C.F.R. §§ 404.1509, 404.1522;

*Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691 (6th Cir. 1985).  Basic work

activities include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b).

The Sixth Circuit evaluates whether an impairment is severe using a *de minimis* standard

– with an impairment considered not severe "only if it is a slight abnormality that minimally

affects work ability regardless of age, education, and experience."  *See Higgs v. Bowen*, 880 F.2d

860, 862 (6th Cir. 1988) (6th Cir. 1988) (citing *Farris v. Sec'y of Health & Human Services*, 773

F.2d 85, 90 (6th Cir. 1985)); *see also Woods v. Comm'r of Soc. Sec.*, No. 3:18-cv-1070, 2019

U.S. Dist. LEXIS 102805, at \*23-24 (N.D. Ohio Mar. 22, 2019).  This is a low-threshold inquiry

"intended to 'screen out totally groundless claims.'"  *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x

574, 576 (6th Cir. 2009) (quoting *Farris*, 773 F.2d at 89).  Reasonable doubts on severity should

be resolved in favor of the claimant.  SSR 85-28, 1985 SSR LEXIS 19, at \*4-7, 11-12 ("Great

care should be exercised in applying the not severe impairment concept.  If an adjudicator is

unable to determine clearly the effect of an impairment or combination of impairments on the

individual's ability to do basic work activities, the sequential evaluation process should not end

[at Step Two].  Rather, it should be continued.").  If the claimant doesn't show she has *at least*

*one* "severe" impairment, she's categorically *not* disabled.  20 C.F.R. § 404.1520(c).

Mason argues, in part, that substantial evidence does not support the ALJ's determination that she suffers from no severe impairment because the ALJ improperly discounted her subjective symptom complaints.  ECF Doc. 10 at 13-14, 17.  But "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability."  *Yee v. Comm'r of Soc. Sec.*, No. 1:21-CV-02067, 2023 U.S. Dist. LEXIS 3011, at *23 (N.D. Ohio Jan. 6, 2023) (quoting *Jones*, 336 F.3d at 476).  By regulation, when a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g.*, *Showalter v. Kijakazi*, No. 22-5718, 2023 U.S. App. LEXIS 6245, at *13-15 (6th Cir. Mar. 15, 2023); *Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  *See Rogers*, 486 F.3d at 247 (citing 20 C.F.R. § 416.929(a)); 20 C.F.R. § 404.1529(c)(1).  If such an impairment exists, then the ALJ must next "evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  *See* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

In evaluating a claimant's alleged symptoms, the ALJ considers factors including: (i) daily activities; (ii) location, duration, frequency, and intensity of pain or symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication; (v) treatment, other than medication, to relieve pain; (vi) any measures used to relieve pain; and (vii) other factors concerning functional limitations and restrictions due to pain or other symptoms.  *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  However, an "ALJ need not analyze all seven factors."  *Hatcher v. Berryhill*, Case No. 1:18-cv-1123, 2019 U.S. Dist.

14

LEXIS 51811, at *41 (N.D. Ohio March 27, 2019) (internal citations omitted).  It is the ALJ, and not the reviewing court, that must make consistency[3] determinations regarding the claimant's subjective complaints.  *Rogers*, 486 F.3d at 247 (internal citations omitted); *see also Jones*, 336 F.3d at 476 ("Upon review, we are to accord the ALJ's determinations of credibility great weight.").  We are "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476.

Here, the ALJ applied the proper legal standards in evaluating Mason's statements and complaints concerning her symptoms and limitations. The ALJ determined Mason's MDIs could reasonably be expected to cause her alleged symptoms.  (Tr. 22).  But the ALJ found Mason's statements "concerning the intensity, persistence, and limiting effects of these symptoms" were not entirely consistent with the medical evidence and other record evidence.  (Tr. 22).  In discounting Mason's statements regarding the impact of her cerebrovascular accident, the ALJ considered Mason's daily activities, the fact that she had worked after her stroke until her company closed down, and medical evidence that demonstrated a lack of severe impairment. (Tr. 22-23).  Addressing Mason's statements about the intensity of her diabetes and hypertension, the ALJ considered Mason's limited and conservative treatment for those conditions, her prolonged non-compliance with medical recommendations, and medical evidence that showed, "normal diabetic foot examination, normal motor strength and other neurological findings, and the claimant was alert and oriented to all spheres/in no acute distress."  (Tr. 23). Although Mason cites ample evidence to support the severity of her impairments, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record

---

[3] Formerly referred to as credibility determinations.

15

substantial evidence to support a different conclusion.  *Patterson v. Colvin*, No. 1:14CV1132, 2015 U.S. Dist. LEXIS 101836, at *28 (N.D. Ohio May 12, 2015), *report and recommendation adopted*, 2015 U.S. Dist. LEXIS 101835 (N.D. Ohio Aug. 4, 2015); *see also O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020).

Although the ALJ appeared to follow the proper legal procedures with respect to discounting Mason's subjective complaints concerning the severity of her diabetes, stroke-related symptoms, and hypertension, there are issues concerning how the ALJ: (i) made her non-severe determinations as to several unaddressed MDIs; and (ii) discounted the state agency medical consultants' opinions.

### 1. Unaddressed MDIs

The ALJ determined that Mason had the following MDIs: "status post cerebrovascular accident in December of 2018 (prior to the alleged onset date), right-sided sciatica, diabetes mellitus, essential hypertension, vitamin D deficiency, nicotine dependence, mixed hyperlipidemia, caffeine dependence, and obstructive chronic bronchitis."  (Tr. 21).  Although the ALJ specifically analyzed and discussed why she found Masons' stroke-related symptoms, diabetes, and hypertension to be non-severe impairments, she provided no discussion or mention of Mason's other established MDIs, save nicotine dependance.  (Tr. 22-23).  In regard to Mason's right-sided sciatica, the medical evidence demonstrates that she visited the doctor and received treatment for sciatic nerve pain, (Tr. 455-456, 460-462), and she provided subjective reports of pain and the inability to sit or stand for more than 20 minutes, in part, because of her sciatica, (Tr. 41, 45).  With the ALJ having determined that Mason's sciatica was an MDI but then providing no reasoning as to why she determined that it was not a severe impairment, along with other unaddressed MDIs, the ALJ failed to fully articulate her reasoning and the court

cannot conduct a proper review.  *See Fleischer*, 774 F. Supp. 2d at 877.  While this error may not

be sufficient to justify remand on its own, the remaining error does.

### 2.    State Agency Medical Consultants

Mason, disregarding the Appeals Council decision, argues that the ALJ was the only

person to find Mason suffered from no severe impairments even though the state agency medical

consultants found that Mason had severe impairments in the form of diabetes mellitus and late

effects of injuries to the nervous system.  ECF Doc. 14-15.  Mason then asserts that the ALJ

needed to provide sufficient reasoning to explain her decision and indicate where in the record

she found a lack of support or inconsistency.  Mason contends the ALJ failed to build a logical

bridge between the evidence and her conclusion that Mason suffered from no severe impairment

during the period under adjudication.  *Id.* at 15.  The Commissioner responds that the ALJ

acknowledged the state agency consultants' opinions but found them unpersuasive because their

findings were inconsistent with evidence received in this case after their reviews had been

completed.  ECF Doc. 13 at 13.  The Commissioner argues that the ALJ therefore adequately

explained why she found the state agency consultants' opinions were not persuasive.  *Id.*

As part of the Step Two analysis, the ALJ is required to "articulate how [she] considered

the medical opinions and prior administrative medical findings."  20 C.F.R. § 404.1520c(a).  An

ALJ is not required to "defer or give any specific evidentiary weight, including controlling

weight, to any medical opinion(s) or prior administrative finding(s) including those from [the

claimant's] medical sources."  20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Instead, when

evaluating the persuasiveness of medical opinions and prior administrative findings, an ALJ

must consider the following factors: (1) supportability; (2) consistency; (3) relationship with the

claimant; (4) specialization; and (5) "other factors," such as "evidence showing a medical source

has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. §§ 404.1520c(c).  At a minimum, the ALJ *must* explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2) (providing that an ALJ "may, but are not required to, explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings in [the claimant's] case record.").  According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be.  This is the consistency standard.  And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

Even though these new regulations are less demanding than the former rules governing the evaluation of medical evidence and prior administrative findings, an ALJ is still required to provide a coherent explanation of her reasoning.  *See Cormany v. Kijakazi*, No. 5:21CV933, 2022 U.S. Dist. LEXIS 163437, at *7 (N.D. Ohio Sep. 9, 2022) (quoting *Lester v. Saul*, 2020 U.S. Dist. LEXIS 247187, at *39 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted*, 2021 U.S. Dist. LEXIS 6594 (N.D. Ohio Jan. 13, 2021); *see also Stephen D. v. Comm'r of the SSA*, No. 1:22-cv-378, 2023 U.S. Dist. LEXIS 149786, at *6-7 (S.D. Ohio Aug. 24, 2023). The new regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'" *Warren I. v. Comm'r of Soc. Sec.*, No. 5:20-CV-495 (ATB), 2021 U.S. Dist. LEXIS 42246, 2021

WL 860506, at \*8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01, 5858 (January 18, 2017)).  An "ALJ's failure to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the claimant's] disability determination was supported by substantial evidence."  *Cormany*, 2022 U.S. Dist. LEXIS 163437, at \*7 (quoting *Vaughn v. Comm'r of Soc. Sec.*, 2021 U.S. Dist. LEXIS 134907, at \*32 (W.D. Tenn. July 20, 2021); *see also Childers v. Kijakazi*, 2022 U.S. Dist. LEXIS 122706, at \*13 (E.D. Ky. July 12, 2022) ("When the Court is unable to follow the ALJ's logic, error has occurred.")

Here, the ALJ did not sufficiently articulate her reasons for rejecting the state agency medical consultants' findings that Mason suffered from two severe impairments.  The ALJ stated that she found the state agency consultants' physical assessments to be unpersuasive because: (i) those assessments were based on information that was available at the time; and (ii) "additional medical evidence received in the course of developing [Mason's] case for review at the administrative hearing level justifie[d] a conclusion that the claimant does not have a severe physical health impairment."  (Tr. 23)  First, the ALJ's reasoning does not establish whether the ALJ considered any of the regulatory factors under 20 C.F.R. §§ 404.1520c(c) nor does it illustrate how – or whether – she considered the supportability and consistency of the state agency consultants' opinions.  *See* 20 C.F.R. §§ 404.1520c(b)(2), (c).  The ALJ merely stated that her own conclusion was supported by the "additional evidence" received after the state agency consultants had submitted their assessments.  She provided no analysis or explanation as to how the "additional evidence" contradicts or undermines their assessments.  Second, the ALJ did not explain, describe, or cite what specific "additional evidence" within the record supports her conclusion or renders the state agency consultants' assessments unpersuasive.  As such, the court can only speculate as to what evidence the ALJ used to

19

discount the state agency consultants' opinions.  The court also cannot determine whether the ALJ made an improper medical determination.  *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings" (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also See Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 823-24 (N.D. Ohio 2009) ("[A]n ALJ 'does not have the expertise to make medical judgments.'").

Because the ALJ failed to comply with the procedural requirements under 20 C.F.R. § 404.1520c, remand is necessary unless the failure was a harmless error.  *See Thaxton v. Comm'r of Soc. Sec.*, 815 F. App'x 955, 960 (6th Cir. 2020) (quoting *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014)).

### 3.    Harmless Error

The Commissioner's brief implicitly raises a harmless error argument, stating that: (i) if the ALJ had adopted the state agency consultants' findings that Mason had severe impairments but was limited to medium work, such a decision was supported by substantial evidence; (ii) the VE's testimony supported a finding of not disabled if Mason was limited to medium work; (iii) Mason had not demonstrated that she was limited to medium, light, or sedentary work; and (iv) therefore, she cannot show that the ALJ erred by finding her not disabled.  ECF Doc. 13 at 13-14.  I find the Commissioner's potential harmless error argument unpersuasive.

The Sixth Circuit has held that, so long as the ALJ considers all the claimant's impairments in the other steps, any Step Two error is harmless.  *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).  However, it has not addressed the issue of harmless error when an ALJ has ended her analysis and determined there is no disability at Step Two.  Other district courts have adopted an

approach that remand is nearly automatic when the ALJ erred at Step Two in finding that the claimant had no severe impairments and ended the analysis.  *See, e.g.*, *Stone v. Colvin*, Civil Action No. 3:11-CV-1459-BH, 2013 U.S. Dist. LEXIS 70684, at *14-15 (N.D. Tex. May 20, 2013) (collecting cases); *see also Rollins v. Berryhill*, Civil Action No. 7:17-cv-00136-BP, 2018 U.S. Dist. LEXIS 74542, at *12-13 (N.D. Tex. May 2, 2018).

In this instance, the court is unable to find that the ALJ's Step Two error was harmless, because the ALJ cut short the sequential evaluation process and declined to fully consider Mason's disability allegations.  *See Oeser v. Saul*, No. 1:19-cv-16286, 2021 U.S. Dist. LEXIS 94057, at *17-18 (D.N.J. May 18, 2021); *Butler v. Colvin*, No. 15-545, 2016 U.S. Dist. LEXIS 134651, at *29 (E.D. Pa. July 5, 2016).  Given the low threshold of the Step Two inquiry, and its purpose to screen out "totally groundless claims," when a case is resolved at Step Two, it would be inappropriate to label such errors as harmless.  *See Nejat*, 359 F. App'x at 576.  The logical gaps in the ALJ's reasoning here were not harmless.  Moreover, the lack of a logical bridge between the medical evidence and the ALJ's decision prevents Mason from sufficiently understanding the basis for the ALJ's negative findings, thus precluding her from being able to fully challenge the ALJ's reasoning, and it prevents this court from being able to meaningfully review the ALJ's decision. *Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 257 (6th Cir. 2015); *see also Gross v. Comm'r of Soc. Sec.*, 247 F. Supp.3d 824, 830 (E.D. Mich. 2017).  And the court cannot speculate that the error was harmless given the lack of further ALJ analysis.

Accordingly, because the ALJ failed to follow the proper legal standards and failed to sufficiently articulate her reasoning for discounting the state agency consultants' opinions at Step Two, the ALJ's decision must be remanded for further consideration.  *See* 20 C.F.R. §§ 404.1520c(b)(2), (c); *Cormany*, 2022 U.S. Dist. LEXIS 163437, at *7; *cf. Blakley v. Comm'r*

*of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (providing that an ALJ's failure to comply with the procedural requirements for discounting a medical opinion "'denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record'" (citing *Rogers*, 486 F.3d at 243)).

## V.    Conclusion

Because the ALJ failed to apply proper legal standards by failing to adequately articulate why she rejected the state agency consultants' opinions at Step Two and why certain MDIs were not severe impairments, the Commissioner's final decision denying Mason's application for DIB is vacated and Mason's case is remanded for further consideration.

**IT IS SO ORDERED.**

Dated: November 8, 2023

Thomas M. Parker
United States Magistrate Judge